MICHAEL DUBINA et al. v. MESIROW REALTY DEVELOPMENT, INC., et al., Appellants (Litgen Concrete Cutting and Coring Company, Appellee).

Opinion filed July 26, 2001.—Rehearing denied October 1, 2001.

HARRISON, C.J., joined by FREEMAN and KILBRIDE, JJ., dissenting.

Menges, Mikus & Molzahn, of Chicago (Stephen T. Mikus and Scott G. Reno, of counsel), for appellants Mesirow Realty Development, Inc., *et al.*

Robert Marc Chemers, Edward B. Ruff III and Scott L. Howie, of Pretzel & Stouffer, Chtrd., of Chicago, for appellants CCL of Chicago, Inc., *et al.*

Sandra Young and D. Timothy McVey, of Purcell & Wardrope, Chtrd., of Chicago, for appellant Economy Mechanical Industries, Inc.

Stephen A. Rehfeldt, of Mulherin, Rehfeldt & Varchetto, P.C., of Wheaton, for appellant K&S Automatic Sprinklers, Inc.

Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C., of Ottawa (Michael T. Reagan, of counsel), and Kralovec & Marquard, of Chicago (John C. Doyle, William E. Spizzirri and Daniel J. Donnelly, of counsel), for appellee Litgen Concrete Cutting & Coring Co.

JUSTICE THOMAS delivered the opinion of the court:

At issue in this case is whether settlement of a tort action for property damage can meet the good-faith requirement of the Joint Tortfeasor Contribution Act (the Act) (740 ILCS 100/2(c) (West 1994)) when the plaintiffs, as a condition of their settlement agreement, assign their causes of action to a group of the settling defendants. The circuit court of Cook County answered this question in the affirmative and concluded that the settlement reached by the parties was in good faith. The appellate court reversed. 308 Ill. App. 3d 348. We granted the settling defendants' petition for leave to appeal. 177 Ill. 2d R. 315. For the reasons that follow, we affirm the judgment of the appellate court.

The dispute which gave rise to this appeal arose from a fire in April of 1989, which destroyed a building that housed several Chicago art galleries. The fire occurred while the building was undergoing extensive renovation. Numerous works of art were destroyed.

In the wake of the fire, owners of the art galleries who leased space in the building, artists who exhibited work in the galleries, and their insurers, brought a total of 35 separate actions containing the damage claims of 112 separate plaintiffs, in the circuit court of Cook County, to recover for property loss. Most of the actions named as defendants the owners and managers of the building, the general contractors hired to do the renovation work, and their subcontractors. The parties to this appeal include the building owner, Mesirow Realty Development (Mesirow); the general contractor, CCL of

Chicago, Inc. (CCL); and the subcontractors, Creative Construction, Ltd. (Creative), Economy Mechanical Industries, Inc. (EMI), K&S Automatic Sprinklers (K&S), and Litgen Concrete Cutting and Coring Company, Inc. (Litgen).

As we noted when this case previously was before us (*Dubina v. Mesirow Realty Development, Inc.*, 178 Ill. 2d 496, 499 (1997) (*Dubina I*)), plaintiffs' complaints alleged, in general, that the various defendants had been negligent in either causing the fire or contributing to the spread of the fire. Defendants filed answers denying liability. Defendants also filed third-party claims for contribution against one another.

Eventually, plaintiffs' actions were consolidated for discovery and trial. Prior to trial, all of the plaintiffs settled with all of the defendants except two: Litgen and Gelick Foran Associates, Inc. (Gelick Foran). Gelick Foran subsequently obtained summary judgment in its favor and is not involved in this appeal.

The settling defendants entered into 29 separate agreements with plaintiffs. Each agreement required plaintiffs to assign their claims against Litgen and Gelick Foran to certain of the settling defendants. Some also named as additional assignees several insurance companies and other nonparties. See 308 Ill. App. 3d at 350-51.

The particular assignees varied from agreement to agreement. In each case, however, the assignees included settling defendants. Under the terms of the agreements, the settling defendants agreed to pay plaintiffs a particular amount in settlement and a separate but equal amount in exchange for the assignment of plaintiffs' causes of action against Litgen and Gelick Foran. The total amount paid for settlement was approximately $4.5 million. An equal amount was paid for the assignments. Pursuant to the agreements, plaintiffs agreed to cooperate with the assignees in the assignees' litigation against

Litgen and Gelick Foran, and the assignees agreed to reimburse plaintiffs for the cost of that cooperation.

Over the course of a series of hearings in June and July of 1994, the circuit court found that each of the 29 settlement agreements had been made in good faith within the meaning of section 2(c) of the Act (740 ILCS 100/2(c) (West 1994)). The circuit court found no evidence of collusion or fraudulent conduct, and characterized Litgen's position as "drag[ging] their feet and obstruct[ing] the process." The circuit court noted Litgen's objection to the settling defendants' motion for a good-faith finding, but stated that Litgen's position would not promote compromise or settlement. The trial court also concluded that Litgen was in the same position it would have been in even if there had been no assignment of claims.

The circuit court thereupon entered orders dismissing plaintiffs' claims against the settling defendants and dismissing all of the defendants' contribution claims against one another, including the contribution claims asserted by Litgen. Only plaintiffs' actions against Litgen and Gelick Foran remained.

The settling defendants subsequently substituted their attorneys for plaintiffs' attorneys, and moved for voluntary dismissal of plaintiffs' claims against Litgen and Gelick Foran. Their motion was granted on July 28, 1994. Litgen then appealed, contending that the circuit court should not have found the settlement agreements to have been made in good faith and should not have dismissed its contribution claims.

While Litgen's appeal was pending, the settling defendants, who had taken plaintiffs' claims by assignment, refiled those claims against Litgen in the circuit court. The appellate court thereupon dismissed Litgen's appeal in this case for lack of jurisdiction (*Dubina v. Mesirow Realty Development, Inc.*, 283 Ill. App. 3d 36

(1996)). This court subsequently concluded that the appellate court did have jurisdiction and should not have dismissed Litgen's appeal. We therefore reversed and remanded the cause to the appellate court for further proceedings. *Dubina I*, 178 Ill. 2d 496.

On remand, Litgen again argued that the circuit court had abused its discretion when it found the settlement agreements had been made in good faith. As grounds for this contention, Litgen asserted that the agreements violated the Act by allowing the settling defendants to seek indirectly a remedy they could not seek directly, namely, contribution. In addition, Litgen claimed that the portion of the settlement funds designated for assignments deprived Litgen of a setoff in that amount. Litgen further claimed that the assignments contravened the public policy behind the Act, which is to encourage settlement and the equitable sharing of damages.

The appellate court agreed with Litgen and reversed the circuit court's finding that the settlement agreements had been made in good faith. Guided by this court's decision in *In re Guardianship of Babb*, 162 Ill. 2d 153 (1994), the appellate court found the settlement agreements to be antithetical to the Act. 308 Ill. App. 3d at 357. The appellate court concluded that the circuit court had erred in finding the settlement agreements to be in compliance with the Act's good-faith requirement, and also had erred in dismissing Litgen's claims for contribution. 308 Ill. App. 3d at 358.

The settling defendants now appeal the appellate court's decision. Appellate briefs have been filed on behalf of Mesirow, K&S, EMI, and CCL, Creative and Fireman's Fund Insurance Company (hereinafter "the CCL defendants"). The arguments of the settling defendants fall into two general categories: first, that the appellate court erred in relying on *Babb* because this case is distinguish-

able from *Babb*; and second, that even if *Babb* applies, the instant agreements are valid because they were entered into prior to the *Babb* decision.

In reviewing the appellate court's judgment, we must begin with the provisions of the Act itself. The Act provides that where two or more persons are potentially liable in tort for the same injury or the same wrongful death, there is a right of contribution among them. 740 ILCS 100/2(a) (West 1994). This right, which exists only in favor of a tortfeasor which has paid more than its *pro rata* share of damages to the injured party (740 ILCS 100/2(b) (West 1994)), is subject to an important limitation. Under the terms of the statute, no contribution can be obtained by or from a tortfeasor with whom the injured party has settled in good faith. If a tortfeasor settles in good faith, that tortfeasor is not entitled to recover contribution from another tortfeasor whose liability is not extinguished by the settlement (740 ILCS 100/2(e) (West 1994)), and any contribution liability the tortfeasor might otherwise have had to any other tortfeasor is thereby discharged (740 ILCS 100/2(d) (West 1994)).

The requirement of "good faith" is the only limitation which the Act places upon the parties' right to settle and thereby extinguish contribution liability. *Babb*, 162 Ill. 2d at 161. What constitutes "good faith" under the Act is not defined by the statute itself. Whether a settlement was made in good faith is a matter to be determined by the trial court after consideration of all of the surrounding circumstances. *Babb*, 162 Ill. 2d at 162. This totality-of-the-circumstances approach allows trial courts to give effect to the strong public policy favoring the peaceful settlement of claims, and at the same time allows trial courts to be on guard for any evidence of unfair dealing, collusion, or wrongful conduct by the settling parties. *Babb*, 162 Ill. 2d at 162. A trial court's determination as to the good faith of a settlement is a matter

within that court's discretion and will be reversed on appeal only if the trial court abused its discretion. *Babb*, 162 Ill. 2d at 162. However, a settlement agreement that conflicts with the terms of the Act and/or is not consistent with the policies underlying the Act cannot satisfy the good-faith requirement of the Act and cannot thereby discharge the settling tortfeasor from contribution liability. *Babb*, 162 Ill. 2d at 170.

As noted, in finding that the settlement agreements were not made in good faith, the appellate court relied upon this court's decision in *Babb*. In *Babb*, this court considered whether loan-receipt agreements were good-faith settlements under the Act. *Babb*, 162 Ill. 2d 153. In a loan-receipt agreement, a plaintiff typically receives an interest-free loan (the settlement money) from a settling tortfeasor, who then is dismissed from the plaintiff's tort action. *Babb*, 162 Ill. 2d at 168. The terms of the loan-receipt agreement generally provide that the plaintiff is obligated to repay the settlement monies (the loan) received from the settling tortfeasor out of any judgment or settlement that the plaintiff receives from the nonsettling tortfeasors. *Babb*, 162 Ill. 2d at 168.

In finding that loan-receipt agreements violated the good-faith portion of the Act, this court in *Babb* noted that the loan-receipt agreements allowed a settling tortfeasor to accomplish indirectly that which is expressly forbidden by the Act. *Babb*, 162 Ill. 2d at 171-72. The Act prohibits a settling tortfeasor from recovering contribution from another tortfeasor whose liability is not extinguished by the settlement. 740 ILCS 100/2(e) (West 1994). We noted that:

"Loan-receipt agreements, however, allow a settling tortfeasor to subvert this portion of the Act by allowing the settling tortfeasor to obtain contribution indirectly from the nonsettling tortfeasor. The settling tortfeasor obtains indirect contribution because the plaintiff uses damages recovered from the nonsettling tortfeasor to repay the loan to the settling tortfeasor." *Babb*, 162 Ill. 2d at 172.

Because the loan-receipt agreements allowed a settling tortfeasor to achieve indirectly that which it could not do directly, we found that loan-receipt agreements were collusive and not in good faith. *Babb*, 162 Ill. 2d at 172. In addition, we noted that loan-receipt agreements like the one in *Babb* violated the terms of the Act because the loan-receipt agreements attempt to deprive nonsettling tortfeasors of their right to a setoff, which protects nonsettling defendants from paying more than their *pro rata* share of the final damage judgment. *Babb*, 162 Ill. 2d at 172-73. Thus, the loan-receipt agreement not only violated the terms of the Act by depriving the nonsettling defendants of a setoff, it also violated the purpose of the Act, which was to "equitably distribut[e] among all joint tortfeasors the burden of compensating an injured plaintiff." *Babb*, 162 Ill. 2d at 175.

Finally, we also found that loan-receipt agreements frustrated another purpose of the Act, that of encouraging the settlement of claims. *Babb*, 162 Ill. 2d at 176. The settlement of claims was frustrated because, in *Babb*, the plaintiff's estate was required to obtain the City's approval of any settlement between the plaintiff's estate and any nonsettling defendants. *Babb*, 162 Ill. 2d at 176. This court observed that requiring the City's approval of any settlement made any future settlement with other tortfeasors unlikely if not impossible, because the City could veto any proposed settlement, and because the other tortfeasors would be unlikely to settle a claim on terms dictated by another tortfeasor. *Babb*, 162 Ill. 2d at 177. Consequently, this court concluded that loan-receipt agreements violated the terms of and the policies underlying the Act, such that loan-receipt agreements could not be considered "good-faith" settlements within the meaning of the Act. *Babb*, 162 Ill. 2d at 180.

The appellate court in this case acknowledged that the settlement agreements and assignments were not

loan-receipt agreements, but found that the principles underlying *Babb* applied to bar a finding of good faith. Mesirow, K&S, EMI and the CCL defendants each argue that the appellate court erred in failing to consider the defendants' settlement with the plaintiffs as a separate transaction from the plaintiffs' assignment of their claims. The settling defendants note that the trial court found that $4.5 million was an appropriate settlement amount and was made in good faith. Further, in Illinois, a plaintiff may assign his right of recovery in a property damage action. The settling defendants contend that when they received the assignment of plaintiffs' claims, they were no longer "tortfeasors" under the Act, but for all purposes stood in the shoes of plaintiffs from whom they took the assignments. As plaintiffs, the settling defendants are free to pursue their actions against Litgen. The settling defendants argue that because the assignment transaction is entirely separate from the settlement transaction, the settlements in this case differed from the loan-receipt agreements in *Babb* and were not contrary to the language and policies underlying the Act.

The settling defendants are correct that an assignment of a cause of action for property damage generally is valid in Illinois. See 735 ILCS 5/2—403 (West 1994). In this case, however, we cannot look at the assignment of plaintiffs' claims in a vacuum, but must consider the assignments in conjunction with the settlement agreements. As the appellate court observed, the assignments were a condition precedent to the settlement agreements. 308 Ill. App. 3d at 356. Although the circuit court found $4.5 million to be a good-faith settlement amount, it is clear from the record that the parties would not have settled without the additional $4.5 million and the assignments. Consequently, the assignments must be considered in reviewing the totality of circumstances surrounding a good-faith finding.

Upon review and considering the totality of the circumstances, we affirm the appellate court's finding that the settlement agreements and assignments are contrary to the terms of, and the policies underlying, the Act. The settlement agreements in this case violate the terms of the Act because they deprive Litgen of its statutory right to a setoff. When a settlement is reached in good faith, the amount a plaintiff receives on any claim against any other nonsettling tortfeasors is to be reduced by the amount stated in the settlement agreement, or the amount of consideration actually paid by the settling tortfeasor, whichever is greater. 740 ILCS 100/2(c) (West 1994). This provision protects nonsettling defendants from paying more than their *pro rata* share of the final damage judgment and reflects a public policy of protecting the financial interests of nonsettling tortfeasors. See *Babb*, 162 Ill. 2d at 173.

Here, $4.5 million was allocated as payment toward the settlement, while another $4.5 million was allocated as payment for the assignments, so that Litgen would be entitled to a setoff of only $4.5 million, even though the settling defendants had paid, and plaintiffs had received, consideration totaling $9 million. The settling defendants respond that the circuit court found that $4.5 million was a good-faith settlement, so that Litgen was not deprived of its setoff despite the amount paid for the assignments. As noted, however, the fact remains that the settlement agreements would not have been entered into absent the additional $4.5 million consideration. The fact that the settling defendants were willing to pay an additional $4.5 million for an assignment of the plaintiffs' causes of action certainly calls into question whether a setoff of only $4.5 million would result in Litgen's paying more than its *pro rata* share of the final damage judgment.

The settlement agreement in this case also defeats

the Act's purpose of equitably distributing among all joint tortfeasors the burden of compensating an injured plaintiff. In receiving the assignment of plaintiffs' causes of action, the settling defendants stand to recoup $4.5 million of their settlement payment (the portion paid for the assignment), as well as any damages exceeding $9 million. For example, if Litgen is found liable for $12 million in damages, it is entitled to a setoff of $4.5 million, with the result that the settling defendants are reimbursed $4.5 million and receive a windfall of $3 million. Such a result simply cannot be reconciled with the Act's purpose to equitably distribute among all joint tortfeasors the burden of compensating an injured plaintiff. For that reason, the settlement agreements in this case are contrary to the purpose of the Act.

The settlement agreements and assignments also violate the Act because they allow the settling defendants to accomplish indirectly that which they could not do directly—recover contribution from Litgen. As noted, the Act prohibits a settling tortfeasor from recovering contribution from another tortfeasor whose liability is not extinguished by the settlement. 740 ILCS 100/2(e) (West 1994). Here, the plaintiffs assigned their causes of action to the settling defendants, thereby allowing the settling defendants, in the guise of plaintiffs, to indirectly recover contribution from Litgen. By incorporating an agreement to obtain an object forbidden by law, such agreements may be regarded as collusive. See *Babb*, 162 Ill. 2d at 172.

For these reasons, we find that the settlement agreements at issue in this case violate both the terms of, and the policies underlying, the Act. Because the settlement agreements violate both the terms of and the policies underlying the Act, the settlement agreements do not satisfy the good-faith requirement of the Act.

K&S makes the additional argument, as it did in the

appellate court, that even if the settlement agreements and assignments are viewed as one transaction, the transaction constitutes a loan-receipt agreement. K&S observes that in *Babb*, this court validated loan-receipt agreements entered into prior to September 29, 1994. Because the agreements in this case were entered into prior to September 29, 1994, K&S maintains that the agreements are valid loan-receipt agreements.

The appellate court found that the settlement agreements and assignments in this case did not fit the definition of loan-receipt agreements. 308 Ill. App. 3d at 354-55. The appellate court's finding was correct. Although K&S points out that no decision ever has defined a loan-receipt agreement, we cannot construe the instant agreements as loan-receipt agreements. There is no loan in this case. Even if the ultimate recovery against Litgen is less than $9 million, plaintiffs are not required to reimburse the settling defendants for the amount paid in settlement and assignment. Absent some type of "loan" component to this transaction, there is no basis for finding the settlement agreements and assignments to be loan-receipt agreements.

Finally, we note that EMI raises the additional argument that this court should affirm the circuit court's good-faith finding as to EMI's settlement agreement with the plaintiffs. EMI points out that it did not take an assignment from plaintiffs. Accordingly, EMI contends that even if this court finds that the assignments were improper under the Act, this court should affirm the trial court's good-faith finding as to EMI.

Here, too, we agree with the appellate court, which in addressing this issue, found that because the settling defendants settled as a group, EMI's payment toward the settlement fund was part of the combined fund used to pay for the settlement and the assignment. 308 Ill. App. 3d at 358. It appears from the record that the funds

contributed by the settling defendants were part of one settlement fund, which then was used toward the settlement payments and the assignment, without any specific allocation of funds. In addition, the settlement payment was contingent upon the assignment. Given the interrelationship of the settlement agreements and the assignments, as well as the intermingling of the contributions by all the settling defendants, this court cannot assume that EMI's contribution was allocated exclusively for settlement. Consequently, we cannot make a good-faith finding as to EMI.

In conclusion, then, we find that the settlement agreements between the plaintiffs and the settling defendants were not made in "good faith" within the meaning of the Act. We further find that the settlement agreements and assignments were not loan-receipt agreements, which would be considered valid under *Babb*. Therefore, we affirm the appellate court's decision reversing the circuit court's finding that the settlement agreements were made in good faith, reversing the dismissal of Litgen's contribution claims, and remanding for further proceedings.

*Affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

Whether the settlement agreements at issue here were made in good faith within the meaning of section 2(c) of the Contribution Act (740 ILCS 100/2(c) (West 1994)) was a matter for the trial court's discretion. *In re Guardianship of Babb*, 162 Ill. 2d 153, 162 (1994). Unlike my colleagues, I do not believe that the trial court abused its discretion when it held that the settlement agreements challenged by Litgen were made in good faith. I would therefore affirm the trial court's judgment and reverse the judgment of the appellate court.

When a settling tortfeasor can establish that the settlement was supported by consideration, that is *prima*

*facie* evidence of the settlement's good faith. See *Solimini v. Thomas*, 293 Ill. App. 3d 430, 437 (1997). Once a preliminary showing of good faith is made, a presumption arises that the settlement is valid. The burden then shifts to the party challenging the settlement to show that it was not made in good faith. *Wilson v. Hoffman Group, Inc.*, 131 Ill. 2d 308, 318-19 (1989). As the Second, Third, Fourth and Fifth Districts of the appellate court have each held, the absence of good faith must be established by clear and convincing evidence. See *Warsing v. Material Handling Services, Inc.*, 271 Ill. App. 3d 556, 560 (2d Dist. 1995); *Alvarez v. Fred Hintze Construction*, 247 Ill. App. 3d 811, 816 (3d Dist. 1993); *Bunge Corp. v. Northern Trust Co.*, 252 Ill. App. 3d 485, 505 (4th Dist. 1993); *Higginbottom v. Pillsbury Co.*, 232 Ill. App. 3d 240, 249 (5th Dist. 1992).

The settling tortfeasors in this case clearly made a *prima facie* showing of good faith. The settlement agreements were supported by millions of dollars in consideration. Those agreements were therefore presumptively valid, and the burden was on Litgen to establish, by clear and convincing evidence, that the agreements had not, in fact, been made in good faith.

In assessing good faith under the totality-of-the-circumstances analysis, a court should consider whether the agreement is consistent with the terms of and the policies underlying the Contribution Act. An agreement that conflicts with the Act's provisions or its underlying policies will not satisfy the good-faith requirement and cannot discharge the settling tortfeasor from contribution liability. *Babb*, 162 Ill. 2d at 170.

Our court has recognized two policies that support the Contribution Act: (1) the promotion of settlement, and (2) the equitable sharing of damages. *Babb*, 162 Ill. 2d at 171. Litgen asserts that the assignment provisions in the agreements at issue here, for which the settling

defendants paid nearly $4.5 million in additional compensation, defeat both policies. They do not.

Nothing about any aspect of the contested assignments can fairly be claimed to have discouraged litigants from coming to the bargaining table and resolving their differences prior to trial. For all parties, the effect of the assignments was to facilitate rather than impede the settlement process. By affording plaintiffs the opportunity to obtain additional sums in exchange for assignment of their causes of action against the nonsettling defendants, the agreements provided an extra inducement for plaintiffs to settle. By giving defendants an opportunity they would not otherwise have had to recover money damages from their nonsettling codefendants, the agreements offered defendants additional incentive to settle. From each side, the assignments thus promoted settlement.

There is likewise no merit to the contention that the assignment agreements will apportion the burden of damages among defendants in a way which is not equitable.

Although the agreements may ultimately enable the settling defendants to recover damages from Litgen, their ability to recover is contingent on the outcome of trial. If Litgen prevails and they lose, their recovery will be nothing and they, rather than Litgen, will bear the full weight of plaintiffs' loss. Even if they do prevail, the recovery will scarcely constitute a windfall. To the extent that the settling defendants succeed in obtaining any money damages, it will be because they were willing to bear the full risk and expense of prosecuting the claims and paid millions of dollars in advance, without recourse, for the right to do so.

There is no unfairness in this for Litgen. Litgen could have settled too, but chose not to, as was its right. While the company still faces litigation, its position is no differ-

ent than it would have been had the settlements not included the assignments and plaintiffs prosecuted their claims against it directly. In either instance, Litgen would not be permitted to recover contribution from the settling defendants, but would be able to claim a setoff against any judgment entered against it for the amount stated in the settlement agreements between plaintiffs and the settling defendants or the actual amount paid by the settling defendants in consideration for the release of the settling defendants from liability, whichever is greater. 740 ILCS 100/2(c) (West 1996). Litgen would be entitled to such a setoff and will be entitled to such a setoff if judgment is ultimately entered against it even if the resultant monetary award is thereby reduced to zero dollars. *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 368 (1995).

My colleagues' concern that Litgen's potential setoff might be inadequate is premature. Whether Litgen is entitled to any setoff is dependent upon the outcome of the trial, which has yet to occur. If Litgen's defense is unsuccessful and it needs to claim a setoff against the judgment entered against it, the amount of the setoff will be a matter for the trial court to determine. If Litgen is dissatisfied by the amount of the setoff allowed by the trial court, it can raise the issue by appeal at that time.

Even if the adequacy of the potential setoff were properly before us, my colleagues' concerns would be misguided. The problem with their analysis is that it overlooks the clear and unambiguous wording of section 2(c) of the Act. While the terms of the settlement agreements at issue here allocate only half of the total consideration paid to the settlement, section 2(c) makes clear that the phrasing of the agreements is not controlling. If the trial court ultimately determines that the full $9 million should be attributed to the settlement and therefore represents "the amount of consideration actu-

ally paid," it may allow the full $9 million as a setoff, notwithstanding the fact that the terms of the agreements purport to allocate only $4.5 million to the settlement.

For Litgen, the principal risk of being the sole remaining nonsettling defendant is that even after setoff for the amounts paid by the other defendants in settlement, the judgment could be so large that it will end up paying an amount disproportionally higher than its actual comparative fault. Again, however, that potential result is unrelated to the fact that plaintiffs have assigned their causes of action to settling defendants. It would exist even if plaintiffs retained their claims and prosecuted them personally.

The settlement agreements in this case are not subject to challenge based on this court's decision in *Babb*, 162 Ill. 2d 153. *Babb* held that a settlement agreement could not be regarded as having been made in good faith within the meaning of the Contribution Act where it was the product of collusion and included a loan-receipt provision. Our opinion expressly noted that we were overturning the trial court's finding of good faith based on "the unique facts of th[e] case" (*Babb*, 162 Ill. 2d at 163). We further held that "our conclusion that loan-receipt agreements may not be considered good-faith settlements" applied only to that case and to settlement agreements executed after September 29, 1994, the date the opinion was filed.

The matter before us today involves assignments of causes of action for property damage, not loan-receipt agreements in a personal injury case, and Illinois law has long recognized the validity of assignments of claims for compensatory damages for damage to property. *Grunloh v. Effingham Equity, Inc.*, 174 Ill. App. 3d 508, 518 (1988). The agreements here were all executed and approved before the September 29 date specified in *Babb*, 162 Ill.

2d at 179. In addition, there is nothing in this case comparable to the collusion condemned in *Babb*. Unlike *Babb*, this litigation was under way when the good-faith finding was sought, no effort was made here to misrepresent the terms of the agreements to the court, and opposing counsel were fully involved in the hearings on the agreements' good faith.

For the foregoing reasons, I would hold that the circuit court did not abuse its discretion when it held that the settlement agreements at issue here had been made in good faith. The judgment of the appellate court should therefore be reversed, and the judgment of the circuit court should be affirmed.

JUSTICES FREEMAN and KILBRIDE join in this dissent.